Dukfee, Judge,
delivered the opinion of the court:
This action is brought by certain property owners of lands located in Oklahoma along the Washita River. Plaintiffs claim that defendant has taken permanent and intermittent easements to flood and deposit silt upon the tracts of land described in the petition, and that plaintiffs are thereby entitled to just compensation under the Fifth Amendment to the Constitution of the United States.
Plaintiffs contend that a dam built by defendant many miles downstream from their lands with its resulting reservoir so slowed the velocity of the stream of the river that a deposit of coarse, sterile sediment was left on the river bottom for miles upstream to and including plaintiffs’ lands. As a result of this deposit the stream became shallower and wider, eroding away the embankments which caused flooding and resulting sand deposits on plaintiffs’ lands and a general ruination of much of the lands.
Defendant, on the other hand, contends that the damage to plaintiffs’ lands cannot be attributed to the construction of the dam. Defendant maintains that the change in the river was the cumulative effect of natural changes which are to be expected in the course of an alluvial stream such as the Washita. Defendant has also raised an affirmative defense that in the event the court should find that there is any relation between defendant’s dam project and the change in the character of the stream, that change occurred more than six years prior to the institution of this suit, and therefore, the court has no jurisdiction over the claim.
The dam involved here, the Denison Dam, and its resulting reservoir, Lake Texoma, are located on the Red River between the States of Oklahoma and Texas. The dam was built pursuant to the Flood Control Act of June 28,1938, 52 Stat. 1215, 1219. The public purposes for which the dam and lake were constructed included flood control and generation of electric power.
The Washita River, the river on which plaintiffs’ lands are located, is an alluvial nonnavigable stream. It originates in the eastern Panhandle of Texas and flows southwesterly across Oklahoma until it empties into Lake Texoma. *989 Historically, the Washita River had distinct and well defined banks and ran in a deep and relatively narrow channel. The area of the headwaters of the stream and some other sections of the river above plaintiffs’ lands were originally sandy grazing areas which were converted to cropland about the time of World War I. Thereafter, drought, wind and rain combined to denude the plowed land of ground cover and to increase erosion. A heavy sand burden was transported into the river, choking the channel; the banks caved in, and the channel became wide and shallow. Floods then deposited the sand and debris over lands in the flood plain and transformed valuable farm and grazing land into wasteland. In the period following World War I, this condition progressed gradually downstream from the Washita headwaters. U.S. Bureau of Reclamation studies of this phenomenon (1943 and 1948) concluded that eventually the valuable lands in the entire river valley would be destroyed, and that while this could take hundreds of years, the river’s condition was so unstable that a maximum flood could cause the destruction at any time.
In 1957 a severe flood did occur, which accelerated the change in the character of the river. The heavy layers of sand deposited along the river became quicksand in places. Trees that lined the banks were undermined and fell into the river which continued to widen and meander. Sterile sand and silt, sometimes several feet thick, were deposited on the lands.
In light of this historical background of the creeping destruction of the Washita River Valley as caused by natural erosive forces, and in light of other evidence introduced at the trial, and embodied in the findings of the Trial Commissioner which we shall now examine, we are of the opinion that the erosion complained of was the result of natural forces, working their way downstream, and in no way caused by defendant’s dam.
The key factor in plaintiffs’ theory of recoveiy pertains to the river’s velocity. Plaintiffs maintain that the dam and Lake Texoma slowed the velocity of the river, causing sedimentary deposits, which deposits in turn caused physical changes to the river bed and banks. However, our Trial *990 Commissioner found, and we agree, that the weight of evidence is that the velocity was increased by reduction of friction brought about by sand covering the rocks and gravel as it worked its way downstream.
Finding 12 provides a sound basis for the conclusion that there was an increase in velocity. Finding 12 states that defendant’s expert witness made a study of the velocity of the flow of the river for the periods from 1938-1942, and also from 1957-1961.[1] The velocity of the stream was plotted against the stream discharge. The study showed that for the earlier period the velocity of the stream did not exceed four feet per second even when the discharge was as high as 20,000 c.f.s. In the later period however, the velocity reached six and seven feet per second when the discharge was as high as 16,000 to 20,000 c.f.s. Plaintiffs’ experts have shrugged these results off as a local condition or “a peculiar circumstance.” We find this type of explanation by plaintiffs’ experts of the results of a scientific study quite unsatisfactory, and a little perplexing.
Finding 11 also gave a reason for the increase in velocity. It stated that it was brought about by sand covering the rocks and gravel as it worhed its way downstream. Finding 13 provides a sound basis for that conclusion. Finding 13 speaks of the three factors that control the velocity of a stream. These are depth of the stream, gradient, and roughness and friction of the channel. Here there was no increase in depth of the stream nor in its gradient. The only factor left that could have caused the increase in velocity was the reduction of friction. The friction was reduced by sand deposits that made the bed of the channel smoother. The fact that velocity increased while more deposition took place can only be explained by the fact that inflow of sediment increased considerably with advancing deterioration of the river. This sediment came out of the watershed, banks and tributaries by erosion.
We have closely examined the record that serves as the basis of these three findings (Findings 11-13) and have de *991 termined that they are factually accurate. They are hereby adopted verbatim as the findings of the court. We therefore conclude that plaintiffs’ lands have been damaged during flood time by being overflowed and covered in various places with coarse sand and sterile silt, or eroded away as a result of a change in the behavior of the Washita River since the early 1940’s; that the sole cause of this change cannot fairly be attributed to construction of the Denison Dam and Lake Texoma, but that it was due to natural conditions which previously affected the lands and the river in its higher reaches for which defendant is not responsible and over which defendant had no control.[2]
Plaintiffs’ petition is dismissed.
FINDINGS OE EACT
Tire court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. This case was filed on July 6,1961, by 15 separate property owners with lands located in Carter and Johnston Counties, Oklahoma, along the Washita River.[3]
They claim that the defendant has taken permanent and intermittent easements to flood and deposit silt upon the tracts of land described in the petition. Plaintiffs seek just compensation pursuant to the Fifth Amendment to the Constitution of the United States in the total amount of $536,080.
2. The Denison Dam and Reservoir on the Red River between the States of Oklahoma and Texas was erected by de *992 fendant pursuant to the Flood Control Act of June 28,1938 (52 Stat. 1215, 1219) and is under control of the Corps of Engineers, TJ.S. Army. This dam impounded the waters forming what is now known as Lake Texoma. The public purposes for which the dam and lake were constructed included flood control and generation of electric power. The top of the power pool was established by the Army Engineers at 617 feet m.s.l. Between that elevation and 640 feet the basin is devoted to flood control water storage.
Fiver diversion into the reservoir began on July 27, 1942, and the water rose behind the dam to 617 feet m.s.l. on March 15,1945. The water usually ranges between elevations 610 and 620 feet m.s.l. but in 1957 fell as low as 601.75 and rose as high as 643.2 feet m.s.l. In the years 1944-1957 it rose above 620 on approximately 21 occasions and in the years 1953-1957 the water level fell below 610 on 11 occasions. The lake had an original capacity of 5,859,000 acre-feet at elevation 640, which represented the crest of the spillway, and a surface area of 144,088 acres. The water level at the dam-site has risen 165 feet on occasion.
3. The Washita Fiver is a meandering, alluvial, nonnavi-gable stream and originates in the high plains of the eastern Panhandle of Texas. The river flows in a southeasterly direction across Oklahoma and empties into Lake Texoma. The Washita has numerous side tributaries. It is approximately 650 miles in length and falls about 2,400 feet between its source and Lake Texoma. Downstream from the Ar-buckle Mountains to the lake the gradient was about 1.5 feet in 1953. This gradient, in the area in issue, is less than elsewhere in the river’s course and in this area the river tends to become wider and shallower.
4. Historically, the Washita Fiver had distinct and well-defined banks and ran in a deep and relatively narrow channel. The area of the headwaters of the stream and some other sections of the river above plaintiffs’ lands were originally sandy grazing areas converted about the time of World War I to cropland. Drought, wind and rain combined to denude the plowed land of ground cover and to increase erosion. A heavy sand burden was transported into the river, choking the channel, the banks caved in and the channel became wide, *993 shallow and braided. Floods deposited sand and debris over lands in the flood plain and transformed valuable farm and grazing land into wasteland. In the period following World War I this condition progressed gradually downstream from the Washita headwaters above Cheyenne, Oklahoma, toward Pauls Valley.
In 1943 and 1948 the U.S. Bureau of Reclamation made field studies of the Washita River basin and, noting the self destruction and progressive deterioration thereof in the region north of the Arbuckle Mountains, concluded that eventually the valuable lands in the entire river valley would be destroyed and that while this conceivably could take hundreds of years the river’s condition was so unstable that the “maximum possible flood, as determined by recent flood studies, could probably do the job at any time.”
5. The lands here in issue lie below the Arbuckle Mountains which, in turn, are below Pauls Valley. Prior to 1941 the river in this area had fairly well-defined banks and was deep and relatively narrow. Plaintiffs testified that there were numerous shoals or rapids in the river where rock formations and a gravel bottom made good fording and watering places for cattle. The river ran from 3 feet in depth to holes as deep as 20 or 30 feet.
6. In the period approximately between 1941 and 1945 some plaintiffs noted a gradual change in the character of the Washita River channel in the area in issue in that the banks eroded, holes filled, the channel began to widen and the rock shoals became covered with sand. Adjacent lands were covered with deposits of coarse sand following flooding.
7. A drought commencing in 1950 was terminated in 1957 by a severe flood which accelerated the change in the character of the river. The heavy layers of sand deposited along the river became quicksand in places and cattle perished there if not found and dug out. Trees that formerly lined the river banks were undermined and fell into the river which continued to widen and meander. First bottom lands were flooded, as historically was the case, but they were damaged by sand and silt which was more or less sterile and sometimes several feet thick. Floods did not increase numerically but *994 their effects were different in the deposition of unusual and unsatisfactorily large quantities of coarse sand on the lands.
8. The evidence received at the trial of this case differs materially on the cause of the damage to plaintiffs’ lands arising from the change in the character of the river. Plaintiffs allege that as long as the Washita was allowed to flow in its usual and natural way they suffered no permanent damage from it. They say that the construction of the Denison Dam, forming Lake Texoma, and a dike around the Cumberland oil field generally raised the level of the water in the river, raised the river bed by siltation and slowed the flow of the water causing the river to deposit its sediment load, overflow its banks and deposit sand on their property; that the overflowing and deposition destroyed the natural river banks and vegetation and caused the river to wander and change its course; that at high-water time the river was thus caused to overflow and destroy valuable crops of alfalfa, cotton, com and peanuts; that the sterile sand deposited on plaintiffs’ lands was good only for growing willow trees, Bermuda grass, noxious weeds such as sand burs, bladder beans and Johnson grass; that it was not possible to cultivate this land and that parts of it became boggy, marshy and with some dangerous quicksand; that some such lands could be used only for pasture; that many valuable lands were eroded away altogether, and that the foregoing is all a continuing process. The conditions thus said to have been created by defendant’s actions are alleged to have become sufficiently stabilized in or about the fall of 1957 for plaintiffs to determine the extent of damage and estate claimed to be taken.
9. Plaintiffs’ expert witnesses were well qualified hydraulic engineers, Dr. Thomas Blench of Edmonton, Alberta, Canada, Professor Jacobus P. Yerschuren of the University of Alberta, and Dr. George W. Reid of the University of Oklahoma. These men have outstanding educational qualifications in their field and extensive experience therein. They studied the Washita River and records available thereon, made reports and testified that in their considered opinion the construction of the dam and lake caused the damage to plaintiffs and denied that the damage would have occurred anyway. Their evidence was that the Washita River candes *995 an annual total load of 22,700 acre-feet of sediment or 21% million tons, 16% million tons of which are dumped into the lake.
The effect of this heavy deposition into the lake was described as creating a delta — a rise in the bed of the river and water levels of the river upstream — which, in turn, caused depositions of silt and sand advancing upstream from the lake at about 2 miles per year to a distance of 60 miles since 1945, a widening of the river, erosion of banks, an increase in meandering, and a rise in the flood plain.
Velocity was described as having decreased because of a decrease in gradient and leveling of the stream bed. It, however, was described as increasing when the lake level dropped seasonally. Velocity was also described as having been increased after approximately 1947 and again in 1957 by virtue of two cutoffs in the river which shortened it below the Arbuckles by approximately 2 miles in length. Increased velocity from decreased friction, as explained by defendant, was considered inadequate by plaintiff’s experts to explain the behavior of the river complained of here although admittedly “one clue” thereto. Velocity increases at Durwood gauge in the center of the area of lands in issue were characterized as a local condition and “a peculiar circumstance” which probably could be explained if recordings from numerous other gauge locations were available on the river.
Upstream conditions were not considered relevant by plaintiffs’ experts in view of their conclusion that the conditions complained of by plaintiffs were believed to have worked upstream from the lake instead of downstream from eroded areas. To the extent that deposition occurred as a result of upstream conditions, it was believed that it was of finer sands and silt than that which damaged plaintiffs’ lands.
10. Defendant admits that the Washita River undoubtedly changed its course in places and deposited silt and sand on some of the plaintiffs’ lands, eroded the banks and widened its course. But, defendant denies that these results were caused by any of its actions and rather were the cumulative effect of natural floods and changes which are to be expected in the course of an alluvial stream such as the Washita; that *996 backwater effects of defendant’s project are downstream from the closest of plaintiffs’ lands; that defendant purchased and owns lands on which any alleged backwater effects of the dam and its lake are manifested; that the damage has worked downstream to plaintiffs rather than upstream, and that, in any event, the change in the character of the river occurred and was observed by some plaintiffs more than 6 years prior to the institution of this suit and thus this court has no jurisdiction over the claims.
11. The evidence as to whether the deposition of sand on plaintiffs’ properties was due to the backwater effect of the defendant’s construction or whether it was a natural event which worked its way downstream from the area where sandy pasture had been put into cropland and eroded, as heretofore described, is irreconcilable. The weight of the credible evidence favors the latter theory. Plaintiffs now concede that sediment at any point on a running stream comes down the stream, that an increase in velocity causes banks to erode and deteriorate and that decreased friction will increase river velocity. To the extent that these factors appear here, however, plaintiffs attribute them to a rising and lowering of the lake level and to the destruction of the growth along the river of vines, grass, weeds and brush which thus permitted widening of the river and an increase in velocity of the river flow by reduction of the friction of the moving water. The weight of the evidence is that velocity here was increased by reduction of the friction brought about by sand covering the rocks and gravel as it worked its way downstream, that this caused the banks to erode and cave in and the river to widen and to transport heavier sandy materials in greater quantities, filling the deep holes, covering the rock shoals, decreasing friction of the bed of the stream and increasing velocity, especially during larger flows, in a vicious circle of increasing destruction progressing downstream. This same pattern was earlier evident on the river in its higher reaches, as heretofore found.
12. In approximately the middle of the area of lands involved in this litigation is the so-called Durwood gauge on the Washita Eiver where velocity at that point is recorded. This information was plotted on a sheet in evidence by Dr. Hans *997 Albert Einstein, an expert witness for defendant. Dr. Einstein is professor of hydraulic engineering at the University of California, an expert in the sedimentation and channel flow of rivers, a consultant and expert who has done work for defendant, for the governments of Mexico and the State of California, and for the member countries of SEATO. He also has had experience and education in both Europe and America. His evaluation covered the periods 1938-1942 and 1957-1961. For those years he plotted the velocity of the stream against the stream discharge. The study demonstrated that for the earlier period the velocity of the stream did not exceed 4 feet- per second even at times when the discharge was as high as 20,000 c.f .s. When the velocity of the stream was plotted against the discharge for the period 1957-1961, however, the velocity for the smaller discharges within the ranges of 2,000 to 6,000 c.f.s remained about the same as the earlier velocities but those in excess of 6,000 increased markedly. For the larger flows between 16,000 and 20,000 c.f.s the velocity reached between 6 and 7 feet per second.
13. The factors controlling the velocity of a stream are (a) depth of the stream, (b) gradient and (c) the roughness of the channel and the friction therein. The latter consideration is directly proportionate to velocity whereas the velocity increases only in relation to the square root of the depth and in relation to the square root of the gradient. In order to double the velocity of the stream by altering the depth, the depth would have to be increased by a factor of four. In order to double velocity by altering the slope, the gradient would have to be increased four times. The evidence does not support a finding of such a change in gradient or increase in depth. The reverse is true. The parties agree that the stream has become wider and more shallow and the gradient has leveled out due to the deposition of sand over the bed of the channel. The sand has also reduced the friction by covering up rough spots, rocks and holes in the river. The fact that velocity has thus increased while more deposition has taken place is explained by the fact that inflow of sediment has increased considerably with advancing deterioration of the river. This sediment has come out of the watershed, the banks, and tributaries by erosion.
*998 14. Defendant’s expert, Einstein, made a graph which records the runoff in Rush Creek which is above the Arbuckle Mountains and the lands of plaintiffs and on which there is a gauge, readings from which he correlated with those of the Durwood gauge. This study shows that within a period of about 1 year after high water in Rush Creek there is a slight increase in the low-water surface at Durwood gauge, indicating sand deposition on the bed of the river at the latter location which has raised the thalweg and that it takes about a year for the sand to wash down from Rush Creek to Durwood. In contrast, there is no correlation between the low-water surface elevations at Durwood and the lake level, which is also plotted. To the extent that there has been stream widening, deposition and delta formation as a result of the backwater effect of the lake it is found that it has been downstream from plaintiffs’ lands and on defendant’s lands.
15. The weight of the credible evidence is that plaintiffs’ first bottom lands have been damaged during flood times by being overflowed and covered in various places with coarse sand and sterile silt, or eroded away, as a result of a change in the behavior of the Washita River since the early 1940’s; that the sole cause of this change, as heretofore described, cannot fairly be attributed to construction of the Denison Dam and Lake Texoma, nor the dike around the Cumberland oil field, but that it was due to natural conditions which previously affected the lands and the river in its higher reaches for which defendant is not responsible and over which defendant had no control and effects of which were first noticed to be developing on plaintiffs’ lands prior to 1945 when the water in the lake reached 617 m.s.l. The plaintiffs themselves had increased the likelihood of such erosion by plowing up their bottom lands near the river for cropland. The closest of the lands of plaintiffs at about river mile 75 is approximately 35 miles above the lake shoreline and 24 miles from the Cumberland dike. Backwater effects have not extended so far. All of plaintiffs’ lands are within the flood plain of the river and have historically been subject to recurring floods, although the deposition thereon has been different and more damaging since 1941, as noted in prior *999 findings. Floods themselves have not increased in frequency as a result of the change in the character of the river.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and therefore, the petition is dismissed.

 This study was made from the readings from a water gauging station, the Durwood gauge, located on the Washita River about in the middle of the lands involved in this litigation.

 Since defendant's defense that the changes involved here occurred more than six years prior to the institution of the suit was contingent upon a finding of liability on defendant’s part it need not be considered.

 The pleadings as amended include the following plaintiffs: C. R. Anderson and Ida Anderson (1) ; W. L. Anderson (2) ; William E. Copeland and Dorthy Copeland (3) ; Jake Hollenbeck and Juanita Hollenbeck (4) ; A. E. Croskell and Joan Croskell (5) ; H. A. Hodges and Arta Hodges (6) ; Robert S. Fitzgerald, Executor of Estate of R. R. Fitzgerald (7) ; Anna Wolfe (8) ; C. E. Mock and C. E. Mock, Jr. (9) ; Minnie Dillon, June Page, Jean Buchanan, Claudine Shafer, Mary O. Cochran, Individuals, and Minnie Dillon, Floyd M. Shafer, and Hoyt C. Page, Trustees (10) ; Billie Barnes, Jr., Marie Middleton, Ethel B. Ritchie, Marguerette Green (12) ; Fred A. Chapman and Elise Chapman (13) ; H. T. Smith and Mrs. H. T. Smith, Vivian 0. Smith, sometimes known as V. O. Smith (14) ; Warren Jones (15).
Plaintiffs (11) in the original petition (C. C. Sterling and Bill Sterling) have been dismissed.